```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                       DISTRICT OF VERMONT
```

UNITED STATES OF AMERICA,         :
                                  :
        Plaintiff,                :
                                  :
        v.                        :   File No. 1:10-cr-00059-jgm-1
                                  :
RICHARD E. FOERSTER,              :
                                  :
        Defendant.                :
_____    :

OPINION AND ORDER
(Doc. 12)

Defendant Richard E. Foerster has moved to suppress statements made to law enforcement officers and evidence of a firearm discovered in his car during a traffic stop on November 10, 2008.  Foerster is charged under 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2) with one count of being a felon in possession of a firearm.  Having considered Foerster's Motion filed July 22, 2010, the Government's Response in Opposition filed August 5, 2010, the testimony of Officers Bassette and Page at the suppression hearing on October 20, 2010, a video recording of the traffic stop, the parties' exhibits, and post-hearing memoranda filed November 4 and November 12, 2010, Foerster's Motion to Suppress is denied for the reasons stated below.

I.   Background

The following facts were adduced at the suppression hearing and are summarized in the parties' memoranda.  Any factual

disputes are resolved to the extent necessary.  Fed. R. Crim. P. 12(d).

On November 10, 2008, Officer Chad Bassette of the Berlin Police Department responded to a 3:30 a.m. call to Middlesex Dispatch regarding an alleged accident on Airport Road in Berlin, Vermont.  The caller reported a Camaro had driven off the road and the driver appeared to be passed out or sleeping.  The video recorder on Officer Bassette's police cruiser was activated as he approached the scene.  The recording shows as Bassette neared the reported accident site, a 1991 Chevrolet Camaro was fully stopped in the travel lane.  Bassette testified he observed a distinct pathway the car had disturbed in the weeds and grass at the side of the road, indicating where the car had gone off and returned to the road.  Bassette parked his cruiser, with the lights activated, behind the stopped car and approached Foerster, the driver.

When asked for identification, Foerster provided a non-driver's license identification card.  Officer Bassette testified he became concerned that Foerster's license might be suspended.  Bassette asked Foerster what had happened, and Foerster responded he had run off the road to avoid hitting a deer.  Officer Bassette told Foerster a caller had reported a driver passed out at the wheel and later trying to leave the area, and asked if

Foerster was leaving the scene because he did not have a valid license.  Foerster nodded in agreement.

Officer Page, who was off-duty at the time, arrived shortly after Officer Bassette, as Bassette was speaking to Foerster.

Officer Bassette then noticed a Central Vermont Hospital bracelet on Foerster's left wrist, and asked if Foerster had taken any alcohol or drugs.  Foerster said he had just left the hospital and taken some medication but told Bassette his driving was not impaired and he was okay.  Foerster could not produce proof of insurance, explaining he had just purchased the car from a friend.  Bassette told Foerster he would not be allowed to drive home, called a tow truck, and discussed the possibility of sending Foerster home with the tow truck driver.

Fifteen minutes into the video recording of the stop, Bassette began to prepare Foerster's four traffic tickets for operating a motor vehicle with a suspended license, without proof of insurance, without proof of registration, and operating a vehicle with a mis-applied inspection sticker.  The recording reflects preparation of the tickets took approximately thirteen minutes.  While Bassette worked on the tickets, Officer Page remained with Foerster, who searched through his paperwork for documentation to refute the violations and smoked a cigarette.  As Officer Bassette returned to Foerster's car with the tickets, Officer Page told Bassette he had seen rolling papers in

Foerster's car.  Officer Page asked for Foerster's consent to search his car, and he consented.  The officers did not immediately search the vehicle, and instead asked Foerster if he had drugs, and if there were drugs in the vehicle.

During this exchange, approximately thirty three minutes into the recording, Middlesex Dispatch informed Officer Bassette that a gun had been stolen from Central Vermont Hospital earlier in the evening.  After receiving this dispatch, Bassette returned to the Camaro and asked Foerster, who was now standing near his open driver's side door, if he had a gun in the car.  Foerster replied he did not.  Bassette informed Foerster of the reported gun theft and again asked for consent to search the car.  Foerster verbally consented to the search.  Foerster then turned to the driver's seat and began to reach for something.  The officers asked Foerster to step away, and when Foerster complied, Officer Page escorted him to the rear of the Camaro.

Officer Bassette retrieved his gloves from the police cruiser, began the search, and saw a brown leather sheath beneath the driver's seat.  He pulled out a hunting knife and loosened a black belt.  Pulling the black belt, Bassette discovered it held a bullet holster and five bullets.  He placed each item on the roof of the car.  Foerster denied knowledge of them.  Bassette then looked on the driver's side floor board and saw the butt of a revolver protruding from under the seat.  He removed the

revolver, an F. Lli Pietta Rough Rider, single-shot, 45-caliber handgun.  According to Officer Bassette, Foerster volunteered he had a conviction, could not have bullets, and was a felon.  Officer Page began to read Foerster his Miranda rights while Bassette called dispatch for a description of the gun stolen from Central Vermont Hospital.

The description of the items stolen from the hospital matched the gun, bullets, knife and holster discovered in the Camaro.  Officer Bassette then placed Foerster under arrest.  When the tow truck arrived after the search, less than eight minutes had elapsed since Bassette had handed Foerster the traffic tickets.  From start to finish, the entire encounter lasted approximately forty minutes.

Foerster was transported to the Berlin Police Department and Bassette read him his Miranda rights again.  Foerster waived his rights and wrote the following sworn statement:

> I was getting in my car to leave C.V.H. after.  I was trying to go home getting seat belted and looked around.  Saw pistol on, knew I should of not been so interested. Window open.  I was being disrespectful. I decided to pick pistol up and put under car seat. Not trying to sell it but to probably give to a friend.  I did not know if it had bullets, I just waited for a safe person.  Car parked totally unlocked next to my driver's door and could see in.  I was telling myself I regret this--

Based on Foerster's prior criminal convictions, the case was transferred to the Bureau of Alcohol, Tobacco, Firearms and Explosives for further investigation.

II.  Discussion

Foerster's initial Motion to Suppress made only two arguments –  first, the stop was not justified by reasonable suspicion; second, the scope and duration of the stop exceeded what was necessary.  His post-hearing memorandum concedes the initial stop was justified by reasonable suspicion, (Doc. 23 at 5), repeats the argument that the scope and duration of the stop were unreasonable in violation of the Fourth Amendment, and presents an additional argument challenging the voluntariness of Foerster's consent to the search on grounds he was not able to leave the scene, and officers did not expressly advise him he could refuse to consent to the search.

If an investigative detention is properly premised upon reasonable suspicion, the next inquiry is whether its scope and duration are reasonable.  United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995).  Both an officer's stop and his inquiry must be "'reasonably related in scope to the justification for their initiation.'" Id. at 61 (quoting Terry v. Ohio, 392 U.S. 1, 29 (1968)).  Whether police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, is crucial."  Id.

Here, the first fifteen minutes of the traffic stop consisted of the officers' efforts to determine whether there had been an accident, the request for Foerster's driver's license and

6

registration, investigation of his suspected suspension, and arranging for a service to tow Foerster's car and transport him home.  Next, Officer Bassette prepared four traffic tickets in just under thirteen minutes.  After Bassette issued the tickets, the parties waited between seven to eight minutes for the tow truck to appear.

The officers' inquiries following the observation of rolling papers did not unreasonably prolong the detention.  Furthermore, those inquiries lasted only approximately two minutes before the officers received a dispatch regarding the gun stolen from Central Vermont Hospital.  The dispatch, together with the information that Forester had left the hospital shortly before he ran off the road, justified the officers' further investigation into Foerster's possession of a weapon.  Foerster verbally consented to the search and the search was conducted before the tow truck arrived.  Here, the officers did not unreasonably extend the duration of the traffic stop – the investigation and issuance of tickets did not take an unreasonably long time, and Foerster was not unreasonably detained while waiting for the tow truck.

With respect to Foerster's consent to the search, the facts indicate his consent was voluntary.  "A search authorized by consent is wholly valid."  Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  Consent must be given voluntarily and may not

be "the product of duress or coercion, express or implied." <u>Id.</u> at 227.  The voluntariness of consent to search is "determined from the totality of all the circumstances."  <u>Id.</u>  The burden is on the government to prove that consent was freely and voluntarily given.  <u>United States v. Arango-Correa</u>, 851 F.2d 54, 57 (2d Cir. 1988).  Finally, police officers are not required "to always inform detainees that they are free to go before a consent to search may be deemed voluntary."  <u>Ohio v. Robinette</u>, 519 U.S. 33, 39-40 (1996).

Here, the totality of circumstances indicates Foerster voluntarily consented to the search of the Camaro.  The videotape of the event does not evidence any duress or coercion.  It is clear Foerster was allowed to move freely about the scene, had attempted to locate documentation to assist the officers, and was free to move and smoke during the encounter.  Foerster verbally consented to the search twice.  Foerster was first informed of the reported gun theft when he consented the second time.  The fact that Foerster remained at the scene following the issuance of tickets is entirely reasonable under these circumstances – he could not drive away and willingly waited to secure a ride with the tow truck.  The officers were not required to tell him he was free to leave or that he could refuse to consent to the search.  The Court therefore finds his consent to the search was voluntary.

III. Conclusion

Because the duration and scope of the traffic stop were not unreasonable, and because Foerster voluntarily consented to the search, the Motion to Suppress his statements and the evidence seized from his car is DENIED.  This case shall appear on the January 5, 2011 trial calendar.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 9th day of December, 2010.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
Senior United States District Judge